## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

### NEWARK VICINAGE

| | |
|---|---|
| STEVEN J. TRZASKA<br>5272 Pineview Drive<br>Center Valley, PA   18034<br>        Plaintiff<br>    v.<br><br>L'OREAL USA, INC.<br>1111 Terminal Avenue<br>Clark, NJ 07066<br><br><br>L'OREAL, S.A.<br>14 Rue Royale 75<br>381 Paris Cedex 08 France<br><br>        Defendants | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:    CIVIL ACTION NO.<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

### COMPLAINT – CIVIL ACTION

1. Plaintiff is Steven J. Trzaska, an adult individual who resides in the Commonwealth of Pennsylvania at the address above set forth.  Plaintiff is a citizen of Pennsylvania.

2. Defendant L'Oreal USA, Inc. is a corporation organized and existing under the laws of the State of Delaware and is a citizen of said State.

3. Defendant L'Oreal, USA, Inc. has at all material times maintained offices in the State of New Jersey at 111 Terminal Avenue, Clark, NJ 07066.

4. At all material times, the Defendant L'Oreal, USA, Inc. has done business in New

1

Jersey by virtue of the operation of its business of development and sale of cosmetics. Said Defendant's business activities in New Jersey have consisted of, but not been limited to, the maintenance of a research facility within New Jersey, and its shipment of goods into and through New Jersey.

5. Defendant L'Oreal, S.A. is a corporation or other business entity organized and existing under the laws of France. Defendant maintains offices at 14 Rue Royale 75 381 Paris Cedex 08 France. Defendant is a citizen of France.

6. Jurisdiction is based on 28 U.S.C. 1332, as the parties are of diverse citizenship and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

7. At material times the Defendant L'Oreal S.A. has done business in the United States, and in the State of New Jersey by virtue of its direction of the affairs of its wholly owned subsidiary, L'Oreal USA, Inc. within said State.

8. At all material times Plaintiff was an employee of Defendants L'Oreal USA, Inc., and L'Oreal, S.A. The said Defendants have been, at material times, employers under the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1 et seq.

9. At all material times the Defendant L'Oreal, S.A. was an employer under CEPA, as it acted at material times, directly and/or indirectly, on behalf of or in the interest of Defendant L'Oreal USA, Inc., with the consent of the said L'Oreal USA, Inc.

10. At all material times Jean Francois Pahin was the Global CFO of the Research and Innovation organization of L'Oreal, S.A.

11. At all material times Laurent Atall was the Global head of the Research and Innovation organization of L'Oreal, S.A.

12. From and after August, 2004 until he was terminated in December, 2014, Plaintiff, a patent attorney, was employed as head of patents by Defendant L'Oreal, USA, Inc. From and after March, 2012 until he was terminated in December, 2014, Plaintiff served as head of patents and business development of L'Oreal, USA, Inc.

13. Plaintiff is and has been at all relevant times a licensed member of the Bar of the Supreme Court of Pennsylvania, having been admitted to practice in said Court in or around November, 1989.

14. Plaintiff is and has been at all relevant times an attorney admitted to practice before the U.S. Patent and Trademark Office, having qualified as a patent attorney in or around 1992.

15. As a member of the said Patent Bar the Plaintiff is governed by rules enacted by the U.S. Patent and Trademark Office as set forth in 37 C.F.R. 11 et seq.(hereinafter "USPTO Rules").

16. As a member of the Bar of the Supreme Court of Pennsylvania Plaintiff is governed by Rules of Professional Conduct in force in said jurisdiction and which govern attorneys so licensed by the Pennsylvania Supreme Court.

17. The USPTO Rules provide mandatory standards of conduct for patent attorneys.

18. Said USPTO Rules of Professional Conduct include, but are not limited to, the following:

(a) 37 CFR 11.301, which provides:

> A practitioner shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law or in fact for doing so that is not frivolous, which includes a good-faith argument for an extension, modification or reversal of existing law.

   (b)  37 CFR 11.303, which provides in relevant part:

      (a) A practitioner shall not knowingly:

      (1) Make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact made to the tribunal by the practitioner;

19. Pennsylvania Rules governing conduct of attorneys provide likewise.

20. From and after Plaintiff's employment in 2004 (and for some time prior thereto), L'Oreal, S.A., the parent company of L'Oreal USA, Inc., set a predetermined numerical quota of how many patent applications it was to file globally on an annual basis.

21. In 2012, the global quota established by L'Oreal, S.A. was 500 or more patent applications.

22. In 2013, the global quota established by L'Oreal, S.A. was 500 or more patent applications.

23. In 2014, the global quota established by L'Oreal, S.A. was 500 patent applications.

24. In 2014, the quota established by L'Oreal, S.A. for its research organization in Clark, NJ, was 40 patent applications.

25. The purpose of establishing the aforesaid quotas, and the business practice of ensuring that the quotas are met, is to maintain and bolster the reputation of L'Oreal, S.A. and L'Oreal USA, Inc. to financial analysts and shareholders following its stock, as innovative science-based players in the field of cosmetics.

26. At relevant times hereto, L'Oreal was the world's leader in gross sales of cosmetics, with annual gross sales at or near $35 billion in each of the years: 2012, 2013, and 2014.

27. In its sales of cosmetics, L'Oreal frequently makes claims on the packaging of its

products that a particular product is covered by a pending patent application.

28. L'Oreal makes such claims on certain of its products to lead consumers to believe that the product in question is innovative, and thus efficacious.

29. In or around January, 2011, Plaintiff was employed as the head of patents for L'Oreal USA. During a meeting that month, the then head of research for L'Oreal, USA, Inc., Eric Bone, intimated that the patent team, of which Plaintiff was the head, was expected to file at least 100 patent applications during 2011.

30. Plaintiff was not personally present at the meeting described in paragraph 29 but learned of the expectation the next day.

31. In October, 2014, Plaintiff had a meeting with J.F. Pahin, and Yoana Land to discuss various patent activities. During that meeting, Mr. Pahin stated that the 100 patent application quota of 2011 was directed by Frederic Roze, the President of L'Oreal, U.S.A., Inc.

32. At L'Oreal, the patenting process begins when a document known as an "invention disclosure" is submitted. The invention disclosure is then vetted by the patent team to determine whether the subject matter merits the filing of a patent application.

33. An invention disclosure is a document which describes the invention and shows what the potentially innovative/patentable subject matter of the invention is.

34. At L'Oreal, once an invention disclosure is received by the patent team, it is then vetted by the assigned patent team member.

35. Once the invention disclosure is vetted, an interview is held with the submitting inventor in order to determine whether the subject matter of the invention is novel and unobvious in view of publicly available prior art relating to the invention. Also, L'Oreal's internal database

of cosmetic formulas is searched to ensure that the subject matter of the invention has not previously been created and/or commercially launched as a product.

36. Submitting inventors are part of the research/scientific staff employed by L'Oreal.

37. It is the legal and professional responsibility of the reviewing patent attorney or patent agent to make a good faith determination whether the subject matter in an invention disclosure is potentially patentable.

38. The term "patentable" is a legal term used in the field of patent practice which has the following meaning: (a) it is new or novel, i.e., it has never been made or described in public in any way, anywhere, before the patent application is filed; (b) it involves an inventive or unobvious step, i.e., the step must not be obvious to others having good knowledge of the subject matter of the invention; and ( c ) the invention is capable of functioning in an industrial/useful application.

39. In 2014, Plaintiff's group was given a quota of 40 patent applications to file. The global quota for 2014 was 500.

40. Plaintiff and his patent attorney colleagues were informed that if the 2014 target of forty (40) filed patent applications was not met, there would be consequences which would negatively impact their careers and/or continued employment.

41. In early 2012 Plaintiff was, in addition to his duties as a patent attorney, given the additional responsibility of head of Business Development for the United States.

42. In 2014, there was an internal initiative to improve the quality of patent applications being filed by L'Oreal. The company initiated this after an evaluation by an outside organization, Ocean Tomo and/or Thompson Reuters, showed that the vast majority of its

inventions were of low or poor quality.

43. As a result of the aforesaid internal initiative, L'Oreal then began requiring inventors to provide examples evidencing that the proposed inventions performed as represented and were thus potentially patentable.

44. As a result of this new initiative, fewer invention disclosures were submitted to the Clark, NJ patent group during the first three quarters of 2014.

45. During the third and fourth quarters of 2014 Plaintiff and his group began receiving urgent messages from top management of L'Oreal USA, Inc. and L'Oreal, S.A. that the global patent quotas were in danger of not being met.

46. As of September, 2014 there was a global total of approximately 100 or more applications filed, with less than 100 more in the preparation or drafting process.

47. As of September, 2014, there had been less than 15 applications filed by the L'Oreal USA research organization, with some ten potential filings in preparation or under review for patentability.

48. As of September, 2014, top management, to wit, Stephan Habif, L'Oreal head of research for the Americas, began forwarding emails form J.F. Pahin and generating emails of his own to the heads of laboratories advising that scientists were required to start submitting invention disclosures on an urgent basis in order for L'Oreal to meet its Clark, NJ quota of 40, and its global quota of 500.

49. Thereafter, Plaintiff and his patent colleagues complained that the quality of invention disclosures was so poor that they did not wish to run afoul of ethical and legal mandates governing their practice as patent attorneys by filing patent applications on these

proposed inventions.

50. In October, 2014, Plaintiff met in Clark, NJ in the office of his U.S. superior at the time, Yoana Land, and with L'Oreal, S.A. CFO Pahin, who was on a visit to the United States from France.

51. During Plaintiff's meeting with CFO Pahin, Plaintiff advised that neither he nor the patent attorneys who reported to him were willing to file patent applications that the attorneys believed were not patentable (the subjects of which were at times admitted to by the submitting inventors to be not patentable) solely for the purpose of meeting L'Oreal's Clark, NJ quota of forty (40) patent filings.

52. Approximately two weeks after Plaintiff's meeting with CFO Pahin, Plaintiff was summoned to a meeting with the head of Human Resources (HR) for research in the U.S., Diane Lewis.

53. Ms. Lewis advised the Plaintiff that she knew of the meeting between Plaintiff and CFO Pahin. She advised the Plaintiff that in response, the Plaintiff had two options: (a) accept fifteen weeks of severance pay based on years of service and leave employment with L'Oreal; or (b) "you can go back to your office and get back to work."

54. At this meeting between Plaintiff and Ms. Lewis, none of the ethical or legal concerns regarding the filing by patent attorneys of applications for patents on items which were not patentable were discussed.

55. After this meeting, Plaintiff requested a meeting with the head of Human Resources for the United States, Ms. Sarah Hibberson, who indicated that she would look into the matter and get back to Plaintiff.

56. On or around November 25, 2014, Plaintiff received a telephone call from Thomas Sarakatsannis, General Counsel of L'Oreal, USA.

57. Mr. Sarakatsannis advised Plaintiff that L'Oreal would provide him a severance package of 40 weeks to leave the company.

58. On December 8, 2014, Plaintiff was summoned into a meeting with Habif and Lewis, who advised the Plaintiff that because he had threatened to begin legal actions if his concerns were not addressed, it was decided that his position was no longer needed, as L'Oreal wished to hire a head of patents of the Americas. This was a job the Plaintiff had been doing since January, 2014. The Plaintiff was then and there advised that he was being terminated, immediately. Ms. Land then escorted Plaintiff to his office, took his company-issued badge, computer and credit card, and escorted him to the parking lot.

59. Plaintiff was terminated for his refusal to draft and file patent applications for proposed inventions which were not patentable. His termination was also for his refusal to allow members of the patent team of which he was the head to draft and file patent applications for proposed inventions which were not patentable. The Defendants' rationale for dismissal as described in paragraph 58 hereof was a mere pretext for the actual reason the Defendants discharged the Plaintiff, i.e., his refusal to sign patent applications for inventions which he did not believe to be patentable, and his refusal to supervise such conduct by patent attorneys and patent agents under his supervision.

60. As corroboration of the allegation of pretext as set forth in paragraph 59 hereof, in or around late December, 2014, L'Oreal advertised the opening of the precise job which Plaintiff held at the time of his discharge. A copy of said advertisement is attached as **Exhibit A** hereto,.

61. Plaintiff's filing of patent applications for inventions which were not patentable, as urged by L'Oreal, would have necessitated his violation of those regulations governing practice of patent attorneys as hereinbefore quoted, and like rules governing the conduct of attorneys licensed in Pennsylvania.

62. The action of the Defendants, and each of them, in discharging the Plaintiff from employment on December 8, 2014 constituted retaliatory action against the Plaintiff for his refusal to participate in an activity, policy and/or practice which the Plaintiff reasonably believed violated those rules and regulations set forth in paragraph 18 hereof, and like rules governing the conduct of attorneys licensed in Pennsylvania.

63. The action taken by Defendants in the retaliatory discharge of the Plaintiff constituted a violation of CEPA.

64. As a proximate and direct result of the actions of the Defendants, and each of them, as hereinbefore set forth, Plaintiff has sustained the following harms and losses:

(a) past and projected loss of income, including salary, and fringe benefits, the latter including bonus income, subsidized health and dental insurance premiums, group life insurance, vacation pay, holiday pay, 401(k) plan contributions, projected defined benefit plan income, projected income under the L'Oreal Supplemental Income Retirement Plan ("SIRP"), and annual profit sharing bonus income; and

(b) anxiety, depression, and emotional distress, including aggravation of certain pre-existent conditions.

65. The actions of the Defendants, and each of them, were without justification or excuse. Further, the said actions were taken with knowledge that the same were violations of

CEPA, and that the course of conduct which the Defendants unsuccessfully sought to require of the Plaintiff was illegal as hereinbefore described.

66. The actions of the Defendants in the retaliatory discharge of the Plaintiff were willful, deliberate and malicious, and were intended to cause harm to the Plaintiff.

WHEREFORE, Plaintiff does pray for judgment in his favor and against Defendants for compensatory and punitive damages against the Defendants; costs of suit; attorney's fees; and such further, additional or different relief as may be allowed by statute or common law.

TRIAL BY JURY IS HEREBY DEMANDED

GERARD J. JACKSON, ESQUIRE
1500 NORTH KINGS HIGHWAY
SUITE 205
CHERRY HILL, NJ 08034
(856) 229-7620

ATTORNEY FOR PLAINTIFF

DATE: 4/16/15

**EXHIBIT A**

L'Oréal > Careers > Search for Job Opportunities >

# JOB POSTING



VP Patent Attorney

Brand/Division Corporate
Function Legal
Location New Jersey - Clark
Country United States
Employment Type Full - Time
Position Type Permanent (long term /no fixed end date)
Vacancy Reference LUSA-046177
Required Education Juris Doctor

Share: > Facebook >  LinkedIn
Twitter

Apply Now    Apply with *LinkedIn*

## Position Description

### MAJOR FUNCTION

Responsible for ensuring that L'Oreal USA is applying for all applicable patents in the hair, skin, and makeup metiers, and that all applications/registrations are in compliance with the global organization's mission and goals. This position is also critical in ensuring that outside organizations are not infringing on the company's current patents. Managing a team of expert researchers and patent agents to ensure compliance with right to market and ability to patent new technologies and innovation

### PRINCIPAL ACCOUNTABILITIES

Reviews internal developments in our research efforts, and does patent searching on those developments.
Determines potential patentability on the U.S. R&D inventions or trademarks
Develop and lead a team of patent agents/senior researchers in their expertise of patent review and searching in the cosmetic industry
Prepares and submits the applications to the Patent Office
Prosecutes the applications as necessary, including their foreign counterparts.
Litigates pending applications and registrations
Monitors possibility of patent infringement on L'Oreal patents.
Reports on potential patent violations, and assists in prosecuting violations.
Evaluates costs to maintain patents on products or technologies.
Leads and direct the work of US patent department and development of the US team develop their competencies in interfacing with the labs and the worldwide DIPI team
Patentability analysis; patent drafting; infringement analysis; technical and legal assistance for IP clauses in development contracts and/or due diligence activities
Meeting with Labs to identify potential inventions and/or topics that require IP expertise
Frequent interactions with business development and contract/legal team, both local and corporate

### RELATIONAL SKILLS

Highly important to build efficient relationships with labs Innovation Packaging team and external law firms, as well as other departments interacting with DIPI (Business Development, legal corporate...)