**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| STEVEN TRZASKA, | Civil Action No. 15-2713 (SDW) (LDW) |
| Plaintiff, | |
| v. | **OPINION** |
| L'ORÉAL USA, INC. and L'ORÉAL, S.A., | |
| Defendants. | October 23, 2020 |

**WIGENTON,** District Judge.

Before this Court are Defendants L'Oréal USA, Inc. ("L'Oréal USA") and L'Oréal S.A.'s ("L'Oréal S.A.") (collectively "Defendants") Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. Jurisdiction is proper pursuant to 28 U.S.C. § 1332. Venue is proper pursuant to 28 U.S.C. § 1391. This opinion is issued without oral argument pursuant to Rule 78. For the reasons stated herein, Defendants' Motions are **GRANTED**.

### I. FACTUAL & PROCEDURAL HISTORY

At all relevant times, Plaintiff Steven J. Trzaska ("Plaintiff"), an attorney admitted in Pennsylvania and before the U.S. Patent and Trademark Office ("USPTO"), was employed by L'Oréal USA as Vice President – Patents and Business Development. Plaintiff was based in L'Oréal USA's Clark, New Jersey location ("Clark"), and alleges that he was terminated after refusing to file bad-faith or frivolous patent applications that would violate his ethical obligations under the Rules of Professional Conduct promulgated by the Pennsylvania Supreme Court and the USPTO (collectively, "RPCs"). (*See* D.E. 10 ¶¶ 16–17, 65.) After he was terminated, Plaintiff

brought suit against Defendants under New Jersey's Conscientious Employee Protection Act ("CEPA"), N.J. Stat. Ann. § 34:19-1 *et seq.* (*Id.* ¶¶ 71, 73.)

This Court previously granted L'Oréal USA's Motion to Dismiss the Amended Complaint and the Third Circuit reversed. *Trzaska v. L'Oréal USA, Inc.*, 865 F.3d 155, 163 (3d Cir. 2017), *as amended* (Aug. 22, 2017). Defendants subsequently filed the instant Motions for Summary Judgment, and all briefs were timely submitted. (D.E. 167-2, 168-1, 175-3, 179 & 180.)[1] The Court summarizes the facts for the purpose of this opinion.[2]

Plaintiff began working at the Clark location of L'Oréal USA[3] in 2004 as Assistant Vice President - Head of Patents.[4] (D.E. 168-2 & 177-2 ¶¶ 1, 3, 6.) In April 2013, Patricia Rocha ("Rocha") was hired to work as an attorney in Clark's patent department and reported to Plaintiff; the reasons for her onboarding are disputed. (D.E. 168-2 & 177-2 ¶¶ 14–15; D.E. 175-1, 179-2 & 180-1 ¶ 24.) With respect to patent matters in Clark, Plaintiff and Rocha maintained regular contact with Denis Boulard ("Boulard"), Director of L'Oréal S.A.'s *Direction Internationale de la Properiété Industrielle* ("DIPI"). (D.E. 168-2 & 177-2 ¶¶ 23–24.) DIPI oversees L'Oréal's patent teams in six countries, including the United States and France. (D.E. 168-2 & 177-2 ¶ 20.) As Director of DIPI as well as a patent practitioner licensed to represent L'Oréal S.A. in France and

---

[1] Plaintiff filed duplicative opposition briefs to the Defendants' motions, as well as duplicative Supplemental Statements of Disputed Material Facts. (*See* D.E. 175-1, 177-1, 175-3 & 177-3.) The Court cites to Docket Entry Numbers 175-1 and 175-3 only.

[2] Unless otherwise noted, the facts are undisputed.

[3] Defendant L'Oréal S.A. is a publicly traded French corporation headquartered in France. (D.E. 168-2 & 177-2 ¶ 2.) L'Oréal USA is the United States subsidiary of L'Oréal S.A. (D.E. 168-2 & 177-2 ¶ 2.) For purposes of its Summary Judgment Motion, L'Oréal S.A. does not challenge that it should be considered Plaintiff's employer under CEPA. (D.E. 175-1 & 179-2 ¶ 11; *see also* D.E. 168-1 at 1, n.1.) Accordingly, the Court does not draw distinctions between L'Oréal USA and L'Oréal S.A. in deciding the parties' motions.

[4] Plaintiff's title changed three times during his employment: he was originally Assistant Vice President – Head of Patents, followed by Vice President – Head of Patents, and finally, Vice President – Patents and Business Development. (D.E. 168-2 & 177-2 ¶ 6.)

before the European Patent Office, Boulard was responsible for ensuring global coordination and alignment among L'Oréal's patent practitioners.  (D.E. 168-2 & 177-2 ¶¶ 23–24.)

*Alleged Patent-Filing Quota:*  Prior to 2014, Defendants had a global objective to file 500-550 patent applications per year.  (D.E. 167-1 & 175-2 ¶ 27; D.E. 175-1, 179-2 & 180-1 ¶ 36.)  For the first time in 2014, Defendants adopted a specific objective of 40 patent applications for Clark.[5]  (D.E. 168-2 & 177-2 ¶ 29; D.E. 175-1, 179-2 & 180-1 ¶ 37; D.E. 167-4, Ex. D ("Trzaska Dep. I") to D.E. 167-3 ("Alito Decl."), Pt. 3 at 21:3–10.)  The patent objective for Clark in 2014 was established in consultation with Rocha, and Plaintiff also had an opportunity to provide feedback.  (D.E. 167-1 & 175-2 ¶¶ 13–14; D.E. 168-2 & 177-2 ¶¶ 25–26; Trzaska Dep. I, Pt. 2 at 15:24–17:5, Pt. 3 at 22:10–23:2; D.E. 169-3 & 169-4, Exs. N & O to D.E. 168-3 ("Savage Decl.").)

To avoid a year-end rush of patent-filings and improve the quality of patents, phased work on patents in the pipeline, specifically work from scientists, was crucial.  (D.E. 168-2 & 177-2 ¶ 30; Trzaska Dep. I, Pt. 2 at 12:17–21.)  For example, Defendants followed an internal patent-filing process that began with scientists' creation of Notes of Intent ("NOIs"), which described the invention and its patentability.  (D.E. 175-1, 179-2 & 180-1 ¶ 27; D.E. 175-7, Ex. 21 ("Patenting Process Chart") to D.E. 175-4 ("Goodman Decl.").)  L'Oréal S.A.'s committee of laboratory heads in Paris reviewed NOIs.  (D.E. 175-1, 179-2 & 180-1 ¶ 27; Patenting Process Chart; *see* Trzaska Dep. I, Pt. 3 at 13:2–4.)  After L'Oréal S.A. conducted its vetting process with respect to NOIs, technical notes were created by scientists and reviewed by Plaintiff for prospective United States patent applications.  (D.E. 175-1, 179-2 & 180-1 ¶ 29; Patenting Process Chart; *see* Trzaska Dep.

---

[5] The parties disagree as to the appropriate language to describe this number.  (*Compare* D.E. 167-1 & 168-2, *with* 175-2 & 177-2; *compare* 175-1, *with* 179-2 & 180-1.)  Defendants use the terms "target" and "goal" while Plaintiff repeatedly uses the word "quota."  (*See, e.g.*, D.E. 167-1 & 175-2 ¶¶ 16, 20; D.E. 168-2 & 177-2 ¶ 30; D.E. 175-1, 179-2 & 180-1 ¶¶ 35–37.)  Plaintiff admits that other than he and Rocha, no one used the word "quota."  (D.E. 167-1 & 175-2 ¶ 21.)  For purposes of this opinion, the Court will refer to the number as an "objective."

I, Pt. 3 at 13:20–25.) Plaintiff testified that it was understood by him and others involved in the process that if scientists delayed their technical notes until December, then lawyers could not complete patent applications by the year's end. (D.E. 168-2 & 177-2 ¶¶ 30–31; Trzaska Dep. I, Pt. 3 at 24:23–26:8.)

It is undisputed that by October 2, 2014, the Clark location had only 20 patent-filings for the year, or one-half of the objective. (D.E. 175-1, 179-2 & 180-1 ¶ 52; D.E. 175-7, Ex. 31 to Goodman Decl.) On October 3, 2014, Plaintiff and Rocha received concerns from management regarding the lack of technical notes from scientists that could be used in support of patent applications. (D.E. 168-2 & 177-2 ¶ 32; D.E. 175-6, Ex. 18 to Goodman Decl.) As a result, Plaintiff and Rocha were asked to assist with obtaining the necessary materials from scientists so that patent applications could be prepared and submitted. (D.E. 168-2 & 177-2 ¶ 32; D.E. 175-6, Ex. 18 to Goodman Decl.) On October 9, 2014, Plaintiff emailed his supervisor stating that "[w]e currently have a sufficient number of technical notes to meet our US target." (D.E. 168-2 & 177-2 ¶ 33 (quoting D.E. 169-7, Ex. R to Savage Decl.).) Plaintiff continued: "[t]here was a miscommunication on my part regarding one table I was looking at. Brazil and Seattle may be short but not Clark." (D.E. 168-2 & 177-2 ¶ 33 (quoting D.E. 169-7, Ex. R to Savage Decl.).) On the same day, Plaintiff sent his supervisor a separate email indicating that seven technical notes could not be filed because a key ingredient in the inventions presented a conflict with a confidentiality agreement. (D.E. 175-1, 179-2 & 180-1 ¶ 58 (citing D.E. 175-7, Ex. 34 to Goodman Decl.).) Plaintiff ended this email by stating that "[t]he best way to describe the current technical note situation is 'fluid/dynamic chaos.'" (D.E. 175-1, 179-2 & 180-1 ¶ 58; (quoting D.E. 175-7, Ex. 35 to Goodman Decl.).) The 2014 patent-filing objective for Clark was ultimately exceeded by 8 applications with 48 total applications filed. (D.E. 167-1 & 175-2 ¶¶ 12, 20; Trzaska

4

Dep. I, Pt. 3 at 9:7–14.)

*Alleged Whistleblowing Activity:* On three separate occasions, Plaintiff raised concerns about Defendants' patent-filing objectives with Jean Francois Pahin ("Pahin"), L'Oréal S.A.'s Chief Administrator and Finance Officer for the Research and Innovation Group.[6] (D.E. 167-1, 175-2 ¶¶ 23–25; D.E. 168-2 & 177-2 ¶¶ 46, 48.) The first conversation occurred in March 2013, before the Clark objective was adopted, during a private meeting between Plaintiff and Pahin in France. (D.E. 167-1 &175-2 ¶¶ 25, 27; D.E. 168-2 & 177-2 ¶ 46; Trzaska Dep. I, Pt. 3 at 36:21–40:7.) Among other topics, Plaintiff voiced concerns about potentially running afoul of his ethical obligations under the RPCs in light of Defendants' patent-filing system which Plaintiff claimed centered on the numbers. (D.E. 167-1 & 175-2 ¶ 26; D.E. 168-2 & 177-2 ¶ 46; Trzaska Dep. I, Pt. 3 at 39:6–21.)

The second conversation occurred in May 2014 in Clark; Plaintiff testified that he expressed similar concerns to Pahin regarding the patent-filing objectives and his ethical obligations. (D.E. 175-1 & 179-2 ¶ 42; Trzaska Dep. I, Pt. 3 at 44:9–15, 54:9–56:12.) The third conversation occurred in October 2014 in Clark. (D.E. 167-1 & 175-2 ¶ 33; D.E. 168-2 & 177-2 ¶ 40.) Plaintiff testified that during this encounter with Pahin, he explained that he and other members of his department "were extremely concerned about running afoul of [their] rules of professional conduct and responsibility because of this quota of patent filings that [they] had to meet," and that no one, including himself, would jeopardize his or her law licenses by filing

---

[6] Rocha had also expressed concerns to management and Plaintiff regarding a lack of adequate technical notes from scientists and Defendants' patent-filing practices and processes. (D.E. 167-1 & 175-2 ¶ 49; D.E. 168-2 & 177-2 ¶ 37.) For example, Rocha felt that her "license and professional obligations [were] being jeopardized." (D.E. 175-1, 179-2 & 180-1 ¶ 59 (quoting D.E. 175-6, Ex. 17 to Goodman Decl.).) However, Plaintiff cannot predicate his CEPA claim on Rocha's subjective beliefs. *See Blackburn v. United Parcel Serv., Inc.*, 3 F. Supp. 2d 504, 515 (D.N.J. 1998), *aff'd*, 179 F.3d 81 (3d Cir. 1999) ("CEPA does not merely require that the employee subjectively believe that certain activities have taken or are about to take place."). Although Rocha submitted her resignation in September 2014, she continued working in some capacity through May 2015. (D.E. 167-1 & 175-2 ¶ 51; D.E. 168-2 & 177-2 ¶ 39.) The impetus for Rocha's resignation is disputed. (D.E. 167-1 & 175-2 ¶ 52.)

"potentially unpatentable patent applications merely to satisfy a quota." (D.E. 167-1 & 175-2 ¶ 34 (quoting Trzaska Dep. I, Pt. 3 at 47:4–14); D.E. 168-2 & 177-2 ¶ 43.) Plaintiff also warned Pahin that Defendants would jeopardize their future ability to claim rights to any patent that arose from an intentionally misleading or fraudulent application. (D.E. 167-1 & 175-2 ¶ 35; D.E. 168-2 & 177-2 ¶ 42; Trzaska Dep. I, Pt. 3 at 50:6–51:18.)

Notwithstanding Plaintiff's voiced concerns, he never filed a fraudulent patent with the USPTO, nor did he do anything unethical in connection with a patent application. (D.E. 167-1 & 175-2 ¶¶ 38–39; D.E. 168-2 & 177-2 ¶ 51; Trzaska Dep. I, Pt. 3 at 51:19–24.) Defendants never requested or ordered Plaintiff to do anything unethical with respect to a patent application; nor did they ever order him—or any other attorney to his knowledge—to file a baseless application. (D.E. 167-1 & 175-2 ¶¶ 41–43; D.E. 168-2 & 177-2 ¶ 51; Trzaska Dep. I, Pt. 3 at 52:4–19, 53:16–54:7.) Plaintiff was not aware of Rocha ever breaching her ethical obligations in connection with a patent application, and, to Plaintiff's knowledge, no one instructed Rocha to file a patent application with inadequate technical notes. (D.E. 167-1 & 175-2 ¶¶ 40, 44; D.E. 168-2 & 177-2 ¶ 51; Trzaska Dep. I, Pt. 3 at 51:25–52:2, 74:16–19.) In addition, Defendants never told Plaintiff that he would be disciplined—or words to that effect—if he did not meet Clark's patent-filing objective. (D.E. 167-1 & 175-2 ¶ 45; D.E. 168-2 & 177-2 ¶ 53; Trzaska Dep. I, Pt. 3 at 107:4–9; *see also id.* at 8:25–9:6, 34:19–35:19.)

On October 24, 2014, Plaintiff met with the Head of Human Resources for Research and Innovation at L'Oréal USA, Diane Lewis ("Lewis"), and the two discussed Plaintiff's prior meeting with Pahin. (D.E. 167-1 & 175-2 ¶ 71; Trzaska Dep. I, Pt. 3 at 75:24–77:4). Lewis presented Plaintiff with two options: 20-weeks of severance pay or continue to work. (D.E. 167-1 & 175-2 ¶ 73; Trzaska Dep. I, Pt. 3 at 79:2–24.) On December 8, 2014, Plaintiff was informed

that he was terminated as a result of a planned reorganization. (D.E. 175-1, 179-2 & 180-1 ¶ 77; Trzaska Dep. I, Pt. 3 at 87:1–88:5.) The true reason for Plaintiff's termination is disputed. (D.E. 167-1 & 175-2 ¶ 74.)

## II.     LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculations, unsupported assertions or denials of its pleadings. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's

7

evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325). Further, the nonmoving party is required to "point to concrete evidence in the record which supports each essential element of its case." *Black Car Assistance Corp. v. New Jersey*, 351 F. Supp. 2d 284, 286 (D.N.J. 2004). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof," then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322–23. Furthermore, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The nonmoving party cannot defeat summary judgment simply by asserting that certain evidence submitted by the moving party is not credible. *S.E.C. v. Antar*, 44 F. App'x 548, 554 (3d Cir. 2002).

**III.   DISCUSSION**

The New Jersey Legislature enacted CEPA to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." *Abbamont v. Piscataway Twp. Bd. of Educ.*, 650 A.2d 958, 971 (N.J. 1994). New Jersey's Conscientious Employee Protection Act provides, in relevant part, that:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following: . . .
>
> c. Objects to, or refuses to participate in any activity, policy or

8

> practice which the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ;
>
> (2) is fraudulent or criminal . . . ; or
>
> (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

N.J. Stat. Ann. § 34:19-3(c). A retaliatory action is defined as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." *Id.* § 34:19–2(e).

To establish a prima facie CEPA claim, Plaintiff must establish four elements: "(1) he reasonably believed that his employer's conduct was violating the law, (2) he performed 'whistle-blowing' activity as defined in the statute, (3) an adverse employment action was taken against him, and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action." *Flear v. Glacier Garlock Bearings, a Div. of Enpro Indus., Inc.*, 159 F. App'x 390, 392 (3d Cir. 2005) (citing *Blackburn v. United Parcel Service, Inc.*, 179 F.3d 81, 92 (3d Cir. 1999)). If the employee establishes a prima facie CEPA claim, courts apply the burden shifting test articulated in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Blackburn*, 179 F.3d at 92. Thus, the burden of production shifts to the employer, who must provide a legitimate, non-retaliatory reason for its adverse action; if the employer furnishes a reason, the burden shifts back to the employee who must demonstrate that the employer's justification is pretextual. *Id.*

The New Jersey Supreme Court has stated that the first prong "does not require a plaintiff to show that a law, rule, regulation or clear mandate of public policy actually would be violated if all the facts he or she alleges are true. Instead, a plaintiff must set forth facts that would support

9

an objectively reasonable belief that a violation has occurred." *Dzwonar v. Mcdevitt*, 828 A.2d 893, 901 (N.J. 2003). An employee's reasonable belief "must be such that a 'reasonable lay person would conclude that illegal activity was going on' or at the very least, is imminent." *Blackburn*, 3 F. Supp. 2d at 515 (quoting *Young v. Schering Corp.*, 660 A.2d 1153, 1158 (N.J. 1995)). Accordingly, at this stage, the court must determine whether the record contains evidence from which a reasonable juror could conclude that Defendants engaged in wrongdoing such that "a substantial nexus [exists] between the complained-of conduct and a law or public policy identified by the court or [P]laintiff." *Patterson v. Glory Foods, Inc.*, 555 F. App'x 207, 212 (3d Cir. 2014). If a court finds a substantial nexus, then the jury must decide whether the employee indeed held "such a belief and, if so, whether that belief was objectively reasonable." *Dzwonar*, 828 A.2d at 901–02.

Significantly, in this case the Third Circuit held that a violation of public policy under CEPA can occur when "[a]n instruction, coercion, or threat by an employer . . . result[s] in the disregard of obligatory ethical standards of one's profession," such as the RPCs. *Trzaska*, 865 F.3d at 161. Any assertion that an RPC violation had occurred or was imminent is wholly undermined by Plaintiff's testimony. *See Patterson*, 555 F. App'x at 211–12. During his deposition, Plaintiff testified that (i) he never filed a fraudulent patent application with the USPTO; (ii) he never did anything unethical with respect to a patent filing; (iii) he was never ordered by Defendants to do anything unethical with respect to a patent filing; (iv) he was never told by Defendants to file a patent application which he considered baseless; (v) to his knowledge, no other attorneys in the patent department were ever told or directed by Defendants to file a patent application that those attorneys said was baseless; (vi) to his knowledge, Rocha never engaged in unethical behavior; and (vii) to his knowledge, Rocha was never told to file a patent based on

10

inadequate technical notes. (Trzaska Dep. I, Pt. 3 at 51:19–52:19, 53:12–54:7, 74:16–19.) Thus, it is undisputed that Plaintiff was never told or instructed by Defendants to file a fraudulent or defective patent; nor was Plaintiff aware of any other attorney under his purview who was told or instructed to do the same. (*Id.*; D.E. 167-1 & 175-2 ¶¶ 38–44; D.E. 168-2 & 177-2 ¶ 51.) It is also undisputed that Plaintiff was never threatened with discipline in the event Defendants' patent-filing objectives were not met, which negates any allegation that Plaintiff was implicitly instructed to violate the RPCs. (D.E. 167-1 & 175-2 ¶ 45; D.E. 168-2 & 177-2 ¶ 53; Trzaska Dep. I, Pt. 3 at 107:4–9; *see also id.* at 8:25–9:6 (stating that if the global patent-filing objective was not met "because of the[] enhanced standards, then that's something upper management would have to deal with and accept . . . ."); *id.* at 34:19–35:19 (admitting that an email from L'Oréal USA's Senior Vice President, Head of Research to Plaintiff and others did not use words signifying that the patent objective for 2014 was mandatory or punitive in nature).)

The undisputed facts similarly fail to demonstrate that an RPC violation was imminent. For example, on October 9, 2014, more than two months before the year's end, Plaintiff admitted to his supervisor that his team had "a sufficient number of technical notes to meet our US *target*."[7] (D.E. 168-2 & 177-2 ¶ 33 (quoting D.E. 169-7, Ex. R to Savage Decl.) (emphasis added).) Any concerns Plaintiff harbored about the adequacy of technical notes (*see* D.E. 175-1, 179-2 & 180-1 ¶ 58; D.E. 175-7, Ex. 35 to Goodman Decl.) are diminished by the fact that Clark had 48 patent-applications in 2014—amounting to 8 more than the alleged magic number of 40 applications. (*See* D.E. 167-1 & 175-2 ¶¶ 12, 20; D.E. 168-2 & 177-2 ¶ 29; Trzaska Dep. I, Pt. 3 at 9:7–14, 21:3–10.) Thus, because Clark already had 20 patent applications by October 2014, an additional

---

[7] Indeed, Plaintiff himself used the term "target" to describe Defendants' patent-filing objectives, undermining his steadfast argument that the numbers were not merely aspirational. (*See* D.E. 169-7, Ex. R to Savage Decl.; D.E. 175-3 at 15.) Plaintiff admitted that no one in management used the word "quota" in connection with Defendants' patent-filing numbers. (D.E. 167-1 & 175-2 ¶ 21; Trzaska Dep. I, Pt. 3 at 23:3–24.)

11

28 filings were completed between October and December of 2014. (*See* D.E. 167-1 & 175-2 ¶¶ 12, 20; D.E. 175-1, 179-2 & 180-1 ¶ 52; D.E. 175-7, Ex. 31 to Goodman Decl.; Trzaska Dep. I, Pt. 3 at 9:7–14.)  These numbers may be indicative of a push to complete patent filings as a result of the delayed submission of technical notes.  However, when viewed in a light most favorable to Plaintiff, these undisputed facts, coupled with Plaintiff's admission that he *never* filed or was asked to file a fraudulent patent application (*see* Trzaska Dep. I, Pt. 3 at 51:19–21, 53:16–23), negate the contention that an RPC violation was imminent.

Because Plaintiff and his colleagues were never required, directed, or forced to submit baseless patent applications in violation of their professional obligations (*see* Trzaska Dep. I, Pt. 3 at 51:19–52:19, 53:12–54:7), he fails to establish that Defendants engaged in wrongdoing.  *See Johnson v. New Jersey Higher Educ. Student Assistance Auth.*, No. A-3102-13T1, 2015 WL 6739525, at *6 (N.J. Super. Ct. App. Div. Nov. 5, 2015) (affirming summary judgment in favor of defendants where plaintiff failed to establish a reasonable belief that her supervisor instructed her to commit fraud when she was never told "to fabricate facts, falsify documents, or falsely implicate others").  Even if Plaintiff asserted that *all* outstanding technical notes were non-patentable—which the record does not reflect—his CEPA claim would still fail because he was never asked to and did not file baseless patent applications on Defendants' behalf.  *See Capanna v. Tribeca Lending Corp.*, No. 06-5314, 2009 WL 900156, at *8 (D.N.J. Mar. 31, 2009) (finding that plaintiff failed to establish a reasonable belief that the defendant "was engaging in, or about to engage in, fraud" where plaintiff was never instructed to underwrite a deficient loan application and did not furnish "evidence to suggest that illegal activity occurred or was imminent").

Indeed, after the completion of discovery, the undisputed facts "undercut any suggestion that management encouraged the submission of frivolous patent applications." *See Trzaska*, 865

F.3d at 166; *see also Colon v. Prudential Ins. Co. of Am.*, No. A-4422-04T3, 2006 WL 507732, at *8 (N.J. Super. Ct. App. Div. Mar. 3, 2006) (finding that plaintiff failed to establish the first element of his CEPA claim because the record lacked facts "identify[ing] fraudulent or illegal acts allegedly committed by [defendants]"). For example, Plaintiff testified that management recognized the importance of phasing the invention and patent-filing process after scientists had consistently submitted technical notes in December of previous years, thereby preventing patent lawyers from completing applications before the year's end. (*See* D.E. 168-2 & 177-2 ¶¶ 30–31; Trzaska Dep. I, Pt. 3 at 24:23–26:8.) Furthermore, Plaintiff confirmed that the patent-phasing process was part of Defendants' plan to improve patent quality. (Trzaska Dep. I, Pt. 2 at 12:17–21.) Thus, Defendants' patent-filing process does not support the conclusion that they endorsed the filing of defective patent applications. (*See* Patenting Process Chart.)

Plaintiff points to no law prohibiting Defendants from promulgating an internal patent-filing objective.[8] *See Gibson v. 11 History Lane Operating Co.* No. A-4567-12T3, 2014 WL 700124, at *8 (N.J. Super. Ct. App. Div. Feb. 25, 2014) (finding that plaintiff lacked a reasonable belief that a violation of public policy occurred where the Board of Nursing confirmed that no law prohibited the employer's chart-checking policy). Business objectives are commonplace in a multitude of workplaces and cannot independently serve as a basis for CEPA claims. (*See* D.E. 167-2 at 21); *see also Colon*, 2006 WL 507732, at *10 (noting that an employee cannot object to his employer's drug research merely on grounds that it is controversial because the employer maintains the legal right to make decisions as to its research) (citing *Young v. Schering Corp.*, 645

---

[8] Furthermore, Plaintiff's expert testified that in the abstract, "the mere fact of establishing a target number for patent production is not itself unethical." (D.E. 167-1 & 175-1 ¶ 18 (quoting D.E. 167-4, Ex. J to Alito Decl. at 119:17–20).) Importantly, Plaintiff's expert cannot opine on the ultimate legal issue of whether Plaintiff held an objectively reasonable belief under CEPA. *See, e.g.*, *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) ("Although Federal Rule of Evidence 704 permits an expert witness to give expert testimony that embraces an ultimate issue to be decided by the trier of fact, an expert witness is prohibited from rendering a legal opinion.") (internal quotations omitted).

A.2d 1238 (N.J. Super Ct. App. Div. 1994)).

Important here, Plaintiff's mere disagreement with Defendants' desire to file a specific number of patent applications per year—irrespective of whether that objective is characterized as a "quota," "target," or "goal"—cannot, without more, sustain a CEPA claim. "CEPA affords no protection for the employee who simply disagrees with lawful policies, procedures or priorities of the employer." *Hitesman v. Bridgeway Inc.*, 63 A.3d 230, 238 (N.J. Super. Ct. App. Div. 2013), *aff'd* 93 A.3d 306 (N.J. 2014). Nor is CEPA "intended to spawn litigation concerning the most trivial or benign employee complaints." *Estate of Roach v. TRW*, Inc., 754 A.2d 544, 552 (N.J. 2000); *Blackburn*, 179 F.3d at 93, n.4 (stating that CEPA does not shield "chronic complainers" or "alarmists" who "constantly declar[e] that illegal activity is afoot-or . . . is about to be afoot"). Rather, an employee "must have an objectively reasonable belief that a violation of the relevant legal authority occurred, rather than an objection based on some other principle, no matter how deeply believed." *Hitesman*, 63 A.3d at 239 (internal quotations omitted). Plaintiff's concerns amount to a mere disagreement with Defendants' patent-filing objectives and priorities, nothing more. *See, e.g.*, *Gibson*, 2014 WL 700124, at *8 (affirming summary judgment for defendant because plaintiff's concerns regarding her employer's chart-checking policy merely raised a legitimate difference of opinion).

Accordingly, because Plaintiff failed to "set forth any evidence from which a reasonable person could conclude that [Defendants] engaged in wrongdoing" with respect to its patent applications, and "hence cannot show a substantial nexus between the complained-of conduct and [the RPCs] . . . he cannot meet the first element of a CEPA claim." *See Patterson*, 555 F. App'x at 212 (internal quotations omitted).[9]

---

[9] Because Plaintiff fails to set forth a genuine issue of fact as to the first element, it is not necessary to discuss the remaining CEPA elements. *See, e.g.*, *Clark v. Acme Markets, Inc.*, 2014 WL 714898, at *10 (D.N.J. Feb. 24, 2014).

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motions for Summary Judgment are **GRANTED**.  An appropriate order follows.

                                                  /s/ Susan D. Wigenton  
                                                 **SUSAN D. WIGENTON, U.S.D.J.**

Orig:       Clerk  
cc:         Leda D. Wettre, U.S.M.J.  
              Parties